IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Paula Florence Glick, ) | Civil Action No. 6:12-3294-RBH-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| Carolyn W. Colvin, ) | |
| Commissioner of Social Security,[1] ) | |
| Defendant. ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

### ADMINISTRATIVE PROCEEDINGS

The plaintiff protectively filed an application for disability insurance benefits ("DIB") on July 31, 2009, alleging that she became unable to work on July 31, 2009. The application was denied initially on October 19, 2009. After filing her request for reconsideration, the Social Security Administration determined that she was disabled as of May 1, 2010. On October 8, 2010, the plaintiff requested a hearing to appeal the partially

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

favorable decision, seeking a determination that she became disabled at an earlier date. On May 11, 2011, the administrative law judge ("ALJ") held a hearing at which the plaintiff, who was represented by counsel, testified.  Linda L. Jones, an impartial vocational expert, and Clarice Hanley, the plaintiff's friend, also testified at the hearing.  The ALJ considered the case *de novo*,[3] and on August 8, 2011, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended, from July 31, 2009, through the date of the decision. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied review on October 25, 2012.  The plaintiff then filed this action for judicial review.

---

[3]The plaintiff's attorney apparently thought that the ALJ would only be considering the period between the plaintiff's alleged onset date and the date the Social Security Administration found her disabled, which was not the case.  At the hearing, the following discussion took place between the plaintiff's attorney and the ALJ regarding the issues appropriately before the ALJ:

> ATTY: Your Honor, I think that the issues before us is whether or not Ms. Glick is disabled from the period of July 31, 2009, which is the initial date she says she was disabled, to May 1, 2010, which the Social Security Administration has approved her as being disabled. . . .

> ALJ: Okay.  Just to clear up one issue.  Everything is before me.  So what was determined by DDS is not binding on me.  I will decide disability onset date to the present time.  This is a *de novo* hearing.  So when you appeal it and I hear it, I will make a determination as to disability for the entire period, not just from the initial onset date, from the date they issued the favorable decision, but beyond that.  You're not guaranteed that will stand or cannot guarantee that I will agree with them either in making the determination.

> ATTY: Well the one thing is that, Your Honor, I believe she is currently receiving benefits from the Social Security Administration based upon whenever Social Security said that she was disabled, beginning May 1 of 2010.

> ALJ: That's correct but still I will make that determination whether that remains in effect.  Just so the issues are clear for everybody.

> CLMT: Your honor, may I take out -

> ALJ: So you've indicated it was from the onset date until May 1, 2010, which is not the case.

> ATTY: Well we would take exception with that but we will proceed, Your Honor.

(Tr. 281-83).

2

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

(2)    The claimant has not engaged in substantial gainful activity since July 31, 2009, the alleged onset date (20 C.F.R. § 404.1571 *et seq.*).

(3)    The claimant has the following severe impairments: degenerative joint disease and degenerative disc disease of the lumbar and cervical spine, generalized osteoarthritis, fibromyalgia, polymyalgia, rheumatics, asthma, sleep apnea, obesity, depression/mood disorder, anxiety disorder, and somatoform pain disorder (20 C.F.R. § 404.1520(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5)    After careful consideration of the entire record, I find that the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) with certain additional limitations. Specifically, the claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently. The claimant can sit, stand, and walk for about 6 hours each out of an 8-hour workday. The claimant can never use ladders, ropes, or scaffolds. The claimant is limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling. The claimant can frequently reach overhead. The claimant must avoid concentrated exposure to fumes and hazards. The claimant can perform detailed, but not complex work, meaning work with an SVP of 3 and 4. The claimant is limited to frequent face-to-face contact with the public.

(6)     The claimant is capable of performing past relevant work as a receptionist.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565).

(7)     The claimant has not been under a disability, as defined in the Social Security Act, from July 31, 2009, through the date of this decision (20 C.F.R. § 404.1520(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2)  has a severe impairment, (3)  has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4)  has an impairment that prevents past relevant work, and (5)  has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. § 404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

4

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

5

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 58 years old on the alleged disability onset date and 60 years old at the time of the hearing (Tr. 285). She took art classes in an associate's degree program after high school, but did not complete a degree (Tr. 285, 293-94). She has worked in a variety of jobs, including bank teller, receptionist, furniture store manager, and home care aide for the elderly (Tr. 96, 285-89). She last worked as an activities director at an assisted living facility until July 2009 (Tr. 285, 288).

Dr. Siddesh Gundi[4] was the plaintiff's primary care physician. In July 2008, the plaintiff complained of headaches, asthma, and other "nonspecific symptoms" (Tr. 229-30). Over the next two months, she visited Dr. Gundi twice complaining of leg and ankle pain. An MRI revealed some degenerative changes (Tr. 222-26). An October 2008 bone scan revealed knee and foot arthritis (Tr. 219-20). The plaintiff continued complaining of intense back pain, and an October 2008 lumbar spine MRI revealed a minor disc bulge and mild-to-moderate joint degeneration (Tr. 213-14, 217-19).

In December 2008, the plaintiff began seeing Dr. Amir Agha, a rheumatologist, for pain and stiffness. In the initial evaluation, Dr. Agha noted that radiographs and bone scans were unremarkable and that the plaintiff responded well to

---

[4]In some office notes, this doctor's name is spelled "Siddesh Arashina Gundi, M.D." (*see, e.g.,* Tr. 219), and in others, it is spelled "Siddesha Arashinagundi, M.D." (*see, e.g.,* Tr. 340). For convenience sake, the physician will be referred to as Dr. Gundi throughout this report.

prednisone.  He diagnosed fibromyalgia, polymyalgia rheumatica, and degenerative joint disease (Tr. 178-79).

The plaintiff also saw Dr. Robert LeBlond at Upstate Medical Rehabilitation in early January 2009, also for pain and stiffness (Tr. 140).  Dr. LeBlond found some limited range of motion, a mildly antalgic gait, and some back tenderness, but the exam was otherwise normal.  He suspected arthritis and referred the plaintiff to physical therapy (Tr. 140).  The physical therapist recommended a full course of rehabilitative therapy and a home exercise program (Tr. 144).  However, the plaintiff was discharged in March 2009 for non-compliance (Tr. 143).  She did not attend a single physical therapy session (Tr. 143).

In a January 2009 follow-up, Dr. Gundi noted that the plaintiff's "pain seems to be a whole lot better" and that "[o]verall, she has been doing fairly well" (Tr. 208).  In February 2009, the plaintiff reported her CPAP machine helped her sleep with no difficulties (Tr. 206).  In March and June 2009, the plaintiff complained of headaches, fatigue, neck tenderness, and weight gain (Tr. 201-05).  June 2009 radiographs of the plaintiff's head and face revealed a mild sinus condition (Tr. 197-98).

A June 2009 cervical spine MRI revealed mild foraminal narrowing at C3-4 and a moderate right lateral disc protrusion at C5-6 with moderate-to-severe right neural foraminal narrowing with a posterolateral osteophyte on the left and moderate left neural foraminal narrowing (Tr. 200).  Dr. Gundi did not think surgery appropriate and again referred the plaintiff to physical therapy (Tr. 196).  In July 2009, the plaintiff complained of right knee pain and appeared tearful (Tr. 194-95).  In September 2009, the plaintiff returned complaining of pain, sleep problems, and nasal allergies (Tr. 187-88).

In an October 2009 state review, Dr. Dale Van Slooten determined that plaintiff could lift 20 pounds occasionally, ten pounds frequently, and stand or walk six hours in a workday (Tr. 152).  He included some postural and environmental limitations due

mostly to the plaintiff's back pain and obesity (Tr. 153, 155). He noted radiographs had found minimal abnormality (Tr. 152).

At a November 2009 visit, Dr. Gundi noted that the plaintiff was doing "extremely well" and that her "pain seems to be a whole lot better with low-dose prednisone" (Tr. 186). He noted Cymbalta was helping her depression "a whole lot" (Tr. 186). During a December 2009 visit, the plaintiff had bronchitis and asthma exacerbation (Tr. 184-85). In March 2010, the plaintiff fell on her knee and went to the emergency room (Tr. 159-66). Radiographs showed no abnormality (Tr. 162, 165). Dr. Gundi later noted the knee injury was resolving, and the plaintiff denied other symptoms (Tr. 182-83). Overall, Dr. Gundi noted the plaintiff had lately been doing "extremely well" (Tr. 182).

On a May 2010 mental condition opinion form, Dr. Gundi indicated that medication did not help the plaintiff's condition, her thought processes were slow, her mood depressed and withdrawn, and her attention and memory poor. He opined she had "obvious" work-related limitations as a result of her mental condition (Tr. 181).

A June 24, 2010, lumbrosacral spine x-ray revealed mild osteopenia and mild-to-minimal degenerative changes (Tr. 235).

During a June 2010 state consultative exam, Dr. Lary Korn concluded the plaintiff had certain postural limitations, limited mobility, and could bear weight for two to six hours in a workday (Tr. 231-34). The plaintiff was 5'5" tall and weighed 331 pounds. Dr. Korn observed that the plaintiff's mental status was normal: she smiled easily and often, communicated and comprehended well, and had good cognitive functioning. The plaintiff was well-groomed and tan (Tr. 232). She had full range of motion in her extremities, with

normal strength (Tr. 233).  Upon examining the plaintiff's lumbar spine, Dr. Korn noted that the Waddell's signs[5] were all positive (Tr. 233).

In a July 2010 state review, Dr. Carl Anderson concluded the plaintiff could lift 20 pounds occasionally, ten pounds frequently, and stand and walk six hours in a workday (Tr. 237).  He opined that the plaintiff had certain postural and environmental limitations (Tr. 238, 240).  Furthermore, he noted that Dr. Korn's finding of positive Waddell's signs "deflates credibility somewhat" (Tr. 241).

In a September 2010 state consultative mental status examination, Dr. David Tollison, Ph.D., concluded the plaintiff's mental impairments moderately limited her social functioning, mildly limited her daily activities, and had no effect on her concentration (Tr. 244-48).  He further concluded she may have difficulty with high stress situations (Tr. 247).  The plaintiff said she only "sometimes" has affective distress (Tr. 245).  She also described her daily activities, including going out to a movie several weeks before and going to a baseball game (Tr. 246).

In a September 2010 state review, Dr. Larry Clanton, Ph.D., concluded the plaintiff had moderate limitations with respect to detailed instructions and dealing with the general public, but was not otherwise mentally limited (Tr. 248-64).

In an April 2011 physical medical source statement, Dr. Gundi opined that the plaintiff could lift less than ten pounds, walk only one or two blocks, sit only 45 minutes, and stand less than 30 minutes (Tr. 268).  He opined she could never stoop, crouch, or climb stairs, and was "[i]ncapable of even 'low stress' work" (Tr. 269-70).

At the May 2011 hearing, the plaintiff testified she stopped working due to pain.  After work, she would usually go to bed until it was time to go to work the next day

---

[5] "Waddell's signs are a group of physical signs that may indicate a non-organic or psychological basis for low back pain." *Long v. Astrue*, C.A.No. 6:10-539-SB, 2011 WL 3847081, at *5 n.1 (D.S.C. Aug. 30, 2011).

(Tr. 286-87).  She alleged that obesity makes her depressed and limits her physical activities (Tr. 301-302). She said she took Cymbalta for anxiety and depression, but did not see any mental health specialists (Tr. 293, 301).  The plaintiff's counsel asked if she felt pain after sitting in the hearing for 20 or 30 minutes, and the plaintiff said, "I'm a little uncomfortable" (Tr. 301).

The plaintiff said she does housework slowly, polishes furniture, shops for groceries independently for 45 minutes at a time, reads, cooks, does laundry, cleans her living room, grows mint and herbs in her garden, drives regularly, and paints (Tr. 296-97, 304).  She said she routinely visits her mother and sisters in Florida on holidays, sometimes flying and other times driving (Tr. 305).  The plaintiff added that a sister who lives in Maine recently visited her for a week.  The plaintiff "sometimes" goes out for meals with friends (Tr. 306).

The plaintiff's friend, Ms. Hanly, testified that she and the plaintiff visit each other four or five times each month (Tr. 309).  She said she helps the plaintiff with housework sometimes, has done some cooking for the plaintiff, and once helped the plaintiff clean out her garage (Tr. 310-11).  She said the plaintiff also talks to a neighbor across the street, and that the plaintiff's house was not as neat as it used to be (Tr. 311-12).

On an April 27, 2010, Social Security function report, the plaintiff wrote that she often talks with her son in California, makes coffee, pays bills, watches television, cleans out her cats' litter box, and does laundry (Tr. 125-26).  She wrote that she has several close friends who come over to visit and with whom she occasionally goes out to eat (Tr. 126, 129).  She stated that she regularly goes to the grocery store and pharmacy independently and feels comfortable with changes in routine (Tr. 129, 131).

After the ALJ's August 2011 decision, the plaintiff supplied additional records from Dr. Gundi from May 2010 through January 2012 (Tr. 325-52).  During a May 2010

follow-up, Dr. Gundi noted the plaintiff was "doing fairly well."  She was taking prednisone and was not using her CPAP machine on a regular basis.  She continued to have symptoms of shortness of breath, fatigue, and tiredness (Tr. 329).  At a June 2010 visit, she complained of shortness of breath, but an echocardiogram revealed minimal abnormality (Tr. 332-33).  At a September 2010 follow-up, the plaintiff complained that her CPAP machine was uncomfortable (Tr.336).  In December 2010, Dr. Gundi found she was "doing fairly well."  She had gained a "fair amount of weight," and Dr. Gundi encouraged her to see a doctor for weight reduction surgery (Tr. 339).  In a February 2011 follow-up, she complained of neck pain and non-specific headaches, and in April 2011, she was reportedly "doing fairly well" (Tr. 340, 344).  On April 25, 2011, Dr. Gundi stated that the plaintiff was "definitely unable to perform her work because of her extreme obesity and polymyalgia rheumatica, osteoarthirtis, and also has fibromyalgia and sleep apnea" (Tr. 345).  At subsequent follow-ups in December 2011 and January 2012, the plaintiff reported an asthma flare-up and some difficulty with her CPAP machine (Tr. 351-52).

## ANALYSIS

The plaintiff argues the ALJ erred by:  (1)  failing to assign controlling weight to Dr. Gundi's opinion and (2)  failing to adequately assess her credibility.

### Opinion Evidence

The plaintiff first argues that the ALJ failed to properly consider the opinion of treating physician Dr. Gundi. The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5)  the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §

404.1527(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927]. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

The ALJ assigned "little" weight to Dr. Gundi's physical medical source opinion (Tr. 27-28; *see* Tr. 267-71). He explained that the opinion was inconsistent with the rest of the record, including Dr. Gundi's own treatment notes and the plaintiff's daily activities (Tr. 27). The ALJ noted numerous inconsistencies between the record and Dr. Gundi's opinion (Tr. 27-28). For example, the ALJ noted that Dr. Gundi opined that the plaintiff could never twist, stoop, or crouch (Tr. 27; *see* Tr. 269). However, the plaintiff said she did a variety of activities requiring these movements, such as feeding cats, cleaning out

12

their litter box, sweeping, mopping, vacuuming, doing laundry, and housecleaning (Tr. 27-28; *see* Tr. 125-26, 296-97, 304). Moreover, the treatment notes show that Dr. Gundi's physical exams revealed few abnormalities, relative to the extreme limitations he opined (Tr. 28; *see* Tr. 182-83, 186, 194, 202, 206, 208). The ALJ also observed that Dr. Gundi's opinion was not consistent with the examinations of Drs. Korn and Agha and emergency room staff, who all found much less severe abnormalities (Tr. 28; *see* Tr. 159-62, 168-79, 231-34).

The plaintiff first argues that the ALJ erred in his finding that Dr. Gundi's opinion was inconsistent with other substantial evidence in the record. The plaintiff alleges that certain radiological studies support Dr. Gundi's opinion (pl. brief 7 (citing Tr. 199-200, 217, 220, 222, 224, 235)). However, as argued by the Commissioner, to be accorded controlling weight, the opinion must be both well-supported and not inconsistent with other substantial evidence. The radiographs the plaintiff cites do not speak to the other evidence in the record that is inconsistent with the disabling limitations as found by the ALJ. They say nothing to the plaintiff's daily activities, which the ALJ correctly observed were inconsistent with Dr. Gundi's opined limitations, and they do not address the examinations of Drs. Korn and Agha (Tr. 168-79, 231-34).  Here, the ALJ cited the plaintiff's daily activities and the record's other medical opinions as substantial evidence inconsistent with Dr. Gundi's opinion. Furthermore, the ALJ discussed the radiograph evidence in his discussion of the plaintiff's treatment (Tr. 15), and he expressly relied on medical opinions by doctors who reviewed the record evidence (Tr. 26-28). These included Drs. Van Slooten, Korn, and Anderson (Tr. 26-28; *see* Tr. 151-58, 231-34, 236-43).

The plaintiff next argues that the ALJ erred in finding that Dr. Gundi's opinion was inconsistent with Dr. Korn's examination (*see* Tr. 28), because Dr. Korn's examination "supports [the plaintiff's] complaints of low back, neck, and knee pain and loss of mobility" (pl. brief 9). However, the record supports the ALJ's conclusion that the two opinions are

13

inconsistent. Dr. Gundi indicated the plaintiff could stand 30 minutes, but Dr. Korn opined she could bear weight for two to six hours (Tr. 234, 268). Moreover, Dr. Korn, in his examination of the plaintiff's lower back, found all Waddell's signs positive (Tr. 233), but there is no indication of such a finding in Dr. Gundi's opinion (Tr. 267-71). Finally, Dr. Korn found that the plaintiff's reflexes and strength were normal (Tr. 233), while Dr. Gundi opined that the plaintiff could never lift and carry more than ten pounds (Tr. 269). Furthermore, as noted by the Commissioner, the plaintiff's argument seems to assume that the ALJ found her abilities to be unlimited. In fact, the ALJ found that the plaintiff did have neck and back pain and a loss of mobility, as reflected in the residual functional capacity ("RFC") and supporting analysis (Tr. 20, 23-26). The issue was how far the plaintiff's impairments limited her, and Dr. Korn's opined limitations were less than those of Dr. Gundi, and the ALJ correctly found them somewhat inconsistent.

The plaintiff alleges the ALJ erred by not properly considering certain evidence in his analysis of Dr. Gundi's opinion (pl. brief 7, 9-10). The plaintiff states, "The whole of Dr. Gundi's report goes to great efforts to detail all of the medical evidence used to substantiate his opinion . . . " (pl. brief 7). However, as noted by the Commissioner, the plaintiff does not say what objective evidence Dr. Gundi cited (pl. brief 7-10). Under the opinion's section for "clinical findings and objective signs," Dr. Gundi wrote only an illegible word and "fatigue as above" (Tr. 267). As discussed above, the ALJ discounted the opinion because there was inconsistent substantial evidence, not because Dr. Gundi failed to state the evidence upon which he was relying.

The plaintiff also argues briefly that the ALJ improperly assigned greater weight to the State's physicians (pl. brief 9). However, the ALJ was required to "consider findings and other opinions of State agency medical and psychological consultants . . ., except for the ultimate determination about whether your are disabled." 20 C.F.R. § 404.1527(e)(2)(i). In addition, an ALJ may rely on non-examining physicians' opinions if

14

they are consistent with the record, as they were in the present case. *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted). Also, Fourth Circuit cases "clearly contemplate [that treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians." *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986). In the present case, the ALJ explained that the record evidence was more consistent with the opinions of Drs. Van Slooten, Korn, and Anderson (Tr. 26-27). Thus, the ALJ permissibly assigned them greater weight.

Based upon the foregoing, the undersigned finds that the ALJ's evaluation of Dr. Gundi's opinion was based upon substantial evidence and was without legal error.

### Credibility

The plaintiff next argues that the ALJ failed to adequately evaluate her credibility (pl. brief 10-14). The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold

15

obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565.  However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:

> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider

in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

17

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.  *See* 20 C.F.R. § 404.1529(c).

The ALJ did not find the plaintiff's allegations concerning the intensity, persistence, and limiting effects of her symptoms to be fully credible (Tr. 21-22). The ALJ cited the following evidence in finding the plaintiff less than wholly credible: (1) Dr. Korn found all Waddell's signs positive when he examined the plaintiff's lower back (Tr. 22; *see* Tr. 233, 241); (2) the plaintiff lives alone and independently (Tr. 22; *see* Tr. 285); (3) she does her own housework, including mopping, sweeping, vacuuming, polishing furniture, cooking, loading the dishwasher, laundry, folding clothes, dusting, taking out trash, and cleaning the bathroom, kitchen, and living room (Tr. 22; *see* Tr. 125-26, 297, 304, 311); (4) she shops for groceries for 45 minutes at a time (Tr. 22; *see* Tr. 297); (5) Ms. Hanly said she visited with the plaintiff four or five times each month, and they sometimes went out to eat (Tr. 22; *see* Tr. 309, 312); (6) the plaintiff visits with at least one neighbor (Tr. 22; *see* Tr. 312); (7) she goes out to restaurants with friends (Tr. 22; *see* Tr. 129, 306, 312); (8) her sister visited her for a week, and she recently went to a friend's retirement party (Tr. 22; *see* Tr. 306); (9) the plaintiff routinely flew or drove down to Florida to visit family on holidays (Tr. 22; *see* Tr. 305); (10) the plaintiff paints as a hobby and reads for 20 to 30 minutes at a time (Tr. 22; *see* Tr. 305); (11) she went out to movies and to church (Tr. 22; *see* Tr. 246, 306); (12) she took care of two cats, including feeding them and cleaning out their litter box (Tr. 22; *see* Tr. 125-26, 246); (13) she managed her medications and finances with no assistance (Tr. 22; *see* Tr. 127-28); (14) the plaintiff alleged disabling pain, but did not take her pain medication (Lortab) on a daily basis (Tr. 23; *see* Tr. 139, 294); and (15) she felt only "a little uncomfortable" after sitting 20 or 30 minutes in the hearing (Tr. 23; *see* Tr. 301).

18

The plaintiff first argues that remand is necessary due to the ALJ's use of "boilerplate" language in the credibility analysis (pl. brief 10-11). The plaintiff cites case law from the Seventh and Tenth Circuits in support of her argument that "[t]he habitual use of such boilerplate language shows that the ALJ is simply going through the motions in deciding SSA cases and is not adequately evaluating the testimony of the claimants before him" (*id.* at 11) (citing *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (" 'Such boilerplate language fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible.' ") (quoting *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004)).  While the ALJ here did use some boilerplate language in the decision denying the plaintiff's claim, the ALJ gave specific reasons to support his credibility finding, as discussed above. *See Craven v. Astrue*, No. 9:11–cv–01674-RBH, 2013 WL 1282022, at *5 (D.S.C. March 26, 2013) ("The Court is mindful of the boilerplate language used by the ALJ, but the deference this Court must give to the Commissioner requires that it take the ALJ's findings, as long as they are supported by substantial evidence, at face value.").  Accordingly, this argument is without merit.

The plaintiff appears to argue that the ALJ erred by not properly considering Ms. Hanly's testimony in his credibility analysis (pl. brief 11-12).  The ALJ expressly evaluated Ms. Hanly's testimony (Tr. 28). He noted her testimony was not fully consistent with the rest of the record and thus assigned her statements "some" weight (Tr. 28). However, the ALJ also noted that her testimony partially supported his own analysis of the plaintiff's daily activities (Tr. 22). Specifically, the plaintiff points to Ms. Hanly's testimony as further support for her own self-reports of disabling impairments (pl. brief 11). However, the ALJ properly considered her testimony. First, the ALJ adequately explained the weight he assigned to Ms. Hanly's testimony and thoroughly discussed the impairments that Ms. Hanly described. *See Lee v. Astrue*, No. 1:10–2837-MBS-SVH, 2011 WL 7561514, at *13

19

(D.S.C. Dec. 21, 2011) (citing 20 C.F.R. §§ 404.1529(a), 404.1513(d)) (no error in failing to discuss weight of lay person's testimony because purpose of evaluating lay testimony is to ensure consideration of the effects of the claimant's impairments on ability to work, and ALJ did so), *R&R adopted by* 2012 WL 931974 (D.S.C. Mar. 16, 2012). The ALJ explained that Ms. Hanly's testimony was not entirely consistent with the rest of the record and, accordingly, assigned it less weight. Furthermore, the ALJ addressed all of the impairments Ms. Hanly ascribed to the plaintiff (Tr. 14-28, 309-13). Moreover, even if the ALJ did err in his consideration of Ms. Hanly's testimony, the plaintiff has not shown resulting harm. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding). As the ALJ noted, Ms. Hanly's testimony about the plaintiff's daily activities somewhat reinforced the ALJ's credibility analysis (Tr. 22). For example, the ALJ noted that the plaintiff's social life and independent living seemed inconsistent with disabling pain and depression (Tr. 22, 309-13). Based upon the foregoing, the undersigned finds no error in this regard.

The plaintiff next argues that the ALJ erred by not assigning her "substantial credibility" due to her work record (pl. brief 13 (citing *Dobrowolsky v. Califano*, 606 F.2d 403 (3d Cir. 1979), and *Nanny v. Mathews*, 423 F.Supp. 548 (E.D. Va. 1976)). However, while a plaintiff's work history may be a factor supporting credibility, it is not dispositive. *See* SSR 96–7p, 1996 WL 374186, at *5 (finding that a credibility assessment "must be based on consideration of all the evidence in the case record," which "includes, but is not limited to" a claimant's "prior work record and efforts to work"). Because a claimant's work history is not a controlling factor in assessing credibility and the ALJ offered several reasons for discounting the plaintiff's credibility, the undersigned concludes that the ALJ did not err in failing to assign her "substantial credibility" due to her work record. To the extent the ALJ erred in failing to discuss the plaintiff's work history in his credibility assessment, the undersigned recommends finding that any such error was harmless as the ALJ cited

20

several factors in his credibility analysis, and adding this single factor would not have changed the outcome. *See Jones v. Colvin*, No. 1:12-2894-TMC, 2013 WL 5883382, at *12 (D.S.C. Oct. 30, 2013) (finding ALJ did not err in failing to assign great weight to claimant's work history).

The plaintiff next argues that the ALJ erred in considering the plaintiff's testimony that she felt only "a little uncomfortable" during the hearing. About 20 or 30 minutes into the hearing, the plaintiff's counsel asked her if she was in any pain from sitting. The plaintiff responded that she was "a little uncomfortable" (Tr. 301). The ALJ noted that this, along with other evidence, was consistent with the ability to do light work with additional restrictions, as he formulated the RFC (Tr. 23). The plaintiff argues the ALJ improperly engaged in "sit and squirm" jurisprudence (pl. brief 13-14). However, it does not appear that the ALJ made any assumptions about the plaintiff's pain based on her appearance. Rather, he simply noted that the plaintiff herself testified that, after sitting for 20 or 30 minutes, she was only a little uncomfortable (Tr. 23). Furthermore, it is permissible for the ALJ to consider, as one factor out of many, his observations at the hearing in the credibility analysis. *Massey v. Astrue*, No. 3:10-2943-TMC, 2012 WL 909617, at *4 (D.S.C. Mar. 16, 2012) ("As to the sit and squirm observations, the ALJ may not solely base a credibility determination on his observations at a hearing; however, the ALJ may include these observations in his credibility determination.") (citations omitted); SSR 96-7p, 1996 WL 374186, at *8 (ALJ may consider personal observations of claimant but may not accept or reject the claimant's complaints solely on the basis of such personal observations). Based upon the foregoing, the undersigned finds no error in this regard.

Lastly, the plaintiff argues that the ALJ erred in considering that the plaintiff's positive Waddell's signs showed reduced credibility. "Waddell's signs are a group of physical signs that may indicate a non-organic or psychological basis for low back pain." *Long v. Astrue*, C.A.No. 6:10-539-SB, 2011 WL 3847081, at *5 n.1 (D.S.C. Aug. 30, 2011).

21

Dr. Korn noted that Waddell's signs were all positive when he examined the plaintiff's lower back (Tr. 233). In a July 2010 state review, Dr. Anderson noted that Dr. Korn's finding of positive Waddell's signs "deflates credibility somewhat" (Tr. 241). The ALJ noted this briefly in his credibility analysis (Tr. 22).

The plaintiff argues that because Dr. Korn did not indicate in his report that she was malingering, it was error for the ALJ to consider the positive Waddell's signs as a negative factor in the credibility analysis. In a recent case in this district, the court held that the ALJ "properly discounted Plaintiff's credibility in part because . . . examination indicated that Plaintiff exhibited mixed Waddell's signs." *Brown v. Astrue*, No. 3:10–692-JFA-JRM, 2011 WL 2713877, at *9 (D.S.C. May 27, 2011), *R&R adopted by* 2011 WL 2745781 (D.S.C. July 11, 2011) (citations omitted). In the present case, the ALJ permissibly considered the plaintiff's all-positive Waddell's signs as one credibility factor out of many.

Based upon the foregoing, the undersigned finds that the ALJ's credibility analysis was based upon substantial evidence and was without legal error.

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

January 3, 2014
Greenville, South Carolina

22